IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| DEENA JOHNSON, as Representative of the Estate and Wrongful Death Heirs of Sammy O'Neal Johnson | PLAINTIFF |
| VS. | CIVIL ACTION NO.: 3:14CV25HTW/LRA |
| CHRISTOPHER EPPS, EARNEST LEE, JAMES HOLMAN, WEXFORD HEALTH SOURCES, INC., LISA DAY AND DR. GLORIA PERRY | DEFENDANTS |

### REPORT AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

This matter came before the Court on the Motion for Summary Judgment Based on Qualified Immunity filed by Christopher Epps, Earnest Lee, James Holman and Dr. Gloria Perry (the "State Defendants") and the Plaintiff's Rule 56(d) Motion for Continuance to Conduct Qualified Immunity-Related Discovery.[1] The Undersigned has carefully reviewed the Motions, the Responses and Replies, and the documents submitted in support of those Motions by the parties. Having done so, it is the opinion of the Undersigned that, for the reasons more fully discussed below, the Plaintiff's Motion for Discovery should be granted, under the limited terms described in this Report and Recommendation, and the Defendants' Motion for Summary Judgment should be denied, without prejudice to their right to re-urge their request for this relief after immunity-related discovery has been completed.

---

[1] Also pending on the docket is Defendants' Motion to Dismiss based on Eleventh Amendment Immunity, which sought dismissal of all claims against the State Defendants that were brought in their official capacity. As the Plaintiff has amended her Complaint to dismiss those claims, that Motion should be denied as moot, and the Undersigned so recommends.

1

## SUMMARY OF THE FACTS

Construing, as it must, the Plaintiff's allegations in the light most favorable to her, this Report and Recommendation is based on the following facts. The Plaintiff, Deena Johnson, is the former wife of Sammy O'Neal Johnson, who died on August 12, 2012, while in the custody of the Mississippi Department of Corrections. Immediately prior to the events that form the basis of the action, Sammy Johnson was incarcerated at the Mississippi State Penitentiary at Parchman, Mississippi. Johnson was a diabetic who required extensive monitoring and daily medication for that condition, and he had been housed at the institution's medical unit. On or about July 25, 2012, Johnson was moved to the Central Mississippi Correctional Facility in Pearl, Mississippi. According to the Plaintiff, Johnson's records indicate that it was ordered that he be placed in the Chronic Care unit, but, instead, he was housed in the general population.

When Johnson arrived at CMCF, he informed the control unit guards that he needed to have his blood sugar checked and insulin administered. He also called the Plaintiff to inform her that he had been moved and that he had not received insulin at CMCF. On July 26, Johnson again informed the guards of his situation, and he also called the Plaintiff again to tell her that he had not yet been checked or given insulin. On July 27, Johnson became lethargic and nauseated, and he began vomiting. He asked the guards to call the medical unit to report his condition and ask for insulin. Defendant Lisa Day was the nurse on call, and she told the guards to give him water and to call back the next day if he still felt ill. Johnson called the Plaintiff again to update her on his situation. After that call, the Plaintiff called her state Representative, Rita Parks, to ask her to inquire about Johnson's well-being. Someone from Parks's office made that call and was told that Johnson was being housed in a controlled medical facility and receiving appropriate care.

On July 28, Johnson could not stand or walk, and he had to be helped to the guard station by another inmate. The guards brought Johnson to the medical unit, where his blood sugar level was checked. An ambulance was called, and the first responders noted that Johnson was in "some distress." Subsequently, Johnson was transported by ambulance to the Central Mississippi Medical Center's Emergency Room, where his blood glucose levels were found to be significantly elevated. By the time he reached the hospital, he was in full diabetic ketoacidosis and respiratory distress. Unfortunately, the unregulated blood sugar had caused kidney failure, which prevented blood from reaching his organs. Johnson's organs began to fail, and he developed sepsis from the destruction of bowel tissue. Johnson died about two weeks later.

Of the six named Defendants, four are state employees: Christopher Epps, Earnest Lee, James Holman, and Dr. Gloria Perry. It is these four who have moved for summary judgment. Christopher Epps is the Commissioner of MDOC, Earnest Lee is the Superintendent of MSP, James Holman is the Superintendent of CMCF, and Dr. Gloria Perry is MDOC's Chief Medical Officer. The remaining two Defendants are Wexford Health Sources, Inc., a Pennsylvania corporation that contracts with MDOC to provide health care to inmates at MSP and CMCF, and Lisa Day, a nurse employed by Wexford.

## ANALYSIS

The Plaintiff claims that Epps is responsible for providing safe, humane and constitutional detention for the State's inmates. He is also responsible for the utilization of competent medical vendors. According to the Plaintiff, Epps demonstrated deliberate indifference to Johnson's serious medical condition by allowing, through official policy implementation or the lack thereof, denial of insulin to Johnson. She also contends that Epps has a duty to implement an adequate system of

medical care and policies. He was, therefore, deliberately indifferent to Johnson's condition by allowing his transfer to a facility without there being proper communication between the facilities of Johnson's medical needs. The Plaintiff claims that Epps has a duty to implement a system for inmates to obtain immediate treatment when they are suffering a life-threatening emergency, and he exhibited deliberate indifference by allowing CMCF's staff to initially deny treatment to Johnson. Finally, she maintains that Epps was responsible for hiring, training, and retaining corrections officers and staff who recognize and respond appropriately to medical emergencies.

With regard to Earnest Lee, Plaintiff claims that, as the Superintendent of MSP, he was responsible for hiring, training and retaining staff who provided adequate information about transferring inmates to the receiving institution. For that reason, she believes that Lee exhibited deliberate indifference by allowing Johnson to be transferred to CMCF without adequate communication of his medical needs. She also contends that he is responsible for his staff's failure to follow-up with CMCF personnel to insure that Johnson's serious medical needs were addressed there.

As Superintendent of CMCF, Holman, according to the Plaintiff, had a duty to implement a system of medical care and policies at that facility that were responsive to medical conditions such as diabetes. He was deliberately indifferent to Johnson's medical care by allowing, through an official policy of lack thereof, Johnson to be denied insulin, denied medical treatment, and to be allowed to fall into diabetic ketoacidosis. She contends that Holman had a duty to implement appropriate medical care policies for delivery of insulin. She also believes that he had a duty to implement policies for the appropriate care of medical emergencies, and he was responsible for hiring, training, and retaining staff that could deal appropriately with medical emergencies.

Plaintiff claims that Dr. Perry was primarily responsible for overseeing MDOC's medical vendor, Wexford. For that reason, she had a duty to assure that the vendor had policies and procedures for the provision of medical care that were appropriate and responsive. The Plaintiff believes that Dr. Perry was deliberately indifferent to Johnson's serious medical needs when she allowed, through action or inaction, Wexford to implement procedures allowing Johnson's transfer without the receiving facility knowing that he needed daily doses of insulin.

These Defendants, all of whom are state employees, have moved for summary judgment on the basis of qualified immunity. They argue that the Plaintiff has made only conclusory allegations against Epps, Lee, and Holman, holding that she has not alleged facts reflecting any actual participation in the events that culminated in Johnson's death. They argue, further, that the Plaintiff's claims that these Defendants implemented policies that resulted in Johnson's death are equally insufficient. In support of their claims, these Defendants have offered two Policy statements. The first, Policy No. 25-02-E, is entitled "Healthcare Screening - Intrasystem Transfer." It provides that "transfer offenders will receive a medical, dental and mental health screening performed by health trained or qualified health care personnel upon arrival at the facility." That screening should include inquiry into current health problems, treatment for those health problems, and medication status. The Policy further states, "The Medical Record of any inmate received from the system's reception centers or other state facilities will be reviewed upon the inmate's arrival," to include his current treatment regimen and medications.

According to the Policy, any current chronic medications should be maintained until reviewed by medical personnel of the receiving facility. It concludes, "Arrangements will be made to continue medically necessary care and any special housing or observations, which may be

indicated." Because this Policy was in place when Johnson was transferred, it should have dictated that the administration of insulin would continue at CMCF. If that did not occur, according to these Defendants, it was due to its violation by Wexford's medical staff. Because the policy itself was not deficient, they argue, it could not have resulted in Johnson's death.

Likewise, they argue, Policy No. 25-01-A, entitled "Access to Health Care and Clinical ," provides that inmates will have unimpeded access to health care, through a system in which medical complaints and requests for health are processed on a daily basis. The Policy sets out the procedure for requesting health care and provides that emergency situations "will receive immediate attention." Correctional Officers are to be trained to recognize those situations. According to these Defendants, any failure of CMCF's staff to adhere to these procedures does not establish that the Policy itself was deficient or the cause of Johnson's death. Dr. Perry argues that the Plaintiff's claims against her, based upon her duty to supervise Wexford's performance under its contract with MDOC, suffers from the same deficiencies.

To the extent that the Plaintiff alleges that Epps, Lee, and Holman violated Johnson's constitutional rights by failing to hire, train, or retain staff that would adhere to MDOC's Policies with regard to health care, they argue that her claims cannot be the basis of a claim of deliberate indifference. Such a claim must establish that the inadequacy of the training was obviously likely to result in a constitutional violation, and Plaintiff's conclusory allegations are insufficient. Epps argues that the same analysis should be applied to the claim regarding his selection of Wexford.

Finally, the Defendants argue that their actions were objectively reasonable, in that they could not have reasonably understood that they were engaged in any activity that would violate Johnson's constitutional rights. For that reason, they maintain, they should be immune from suit, "unless all

6

reasonable officials in the defendant's circumstances would have known that the conduct at issue violated clearly established law." Def's Memorandum Brief, p. 14 (citing *Thompson v. Upshur Cnty., Texas*, 245 F.3d 447, 456 (5th Cir. 2001)). Because the Policies referenced above should have protected Johnson from constitutionally inadequate medical care, the Defendants acted reasonably and are entitled to qualified immunity.

In response, the Plaintiff argues that the Defendants are not entitled to rely on the officially promulgated Policies to claim qualified immunity, as there was an established and persistent pattern of inadequate health care throughout MDOC. She claims that the Defendants were aware of this pattern and did nothing to correct it. Because the pattern was so well established, the Plaintiff contends that it became MDOC's policy, despite the official Policies, which were not enforced. Based on the standard for reviewing her Complaint at this juncture, the Plaintiff argues that she has alleged sufficient facts to overcome the Defendants' Motion for Summary Judgment.

In support of her contentions, the Plaintiff has submitted a report dated December 11, 2007, from the Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER) on a study of the medical care provided by Wexford to MDOC inmates at MSP, South Mississippi Correctional Institution (SMCI), and CMCF. The PEER Committee reported on numerous areas in which the medical care provided was below the standards provided for in the contract between Wexford and MDOC. Those areas included triage of sick call requests within twenty-four hours, transferring prisoners and their medical records from one facility to another, and staffing levels. Additionally, the Committee discovered that there was no provision in MDOC's contract with Wexford that provides standards for chronic care of patients with conditions such as diabetes. The Committee found this omission particularly troublesome, stating:

7

Because MDOC may transfer inmates between facilities, or inmates may leave and re-enter the correctional system, consistency among facilities is important in maintaining some of the medical management information and documents for inmates. This is particularly important for inmates under chronic or mental health care, as follow-up and continuity of care are especially significant factors in these inmates' overall health.

Based on its findings, the Committee made several recommendations to Commissioner Epps. To show that these problems persisted, the Plaintiff points to Epps's response to those recommendations. Specifically, in its first recommendation, the Committee suggested that MDOC amend its contract to require Wexford to:

- use a uniform system (such as a date stamp) by which qualified personnel document the date of receipt of inmates' sick call requests and the date on which such sick call requests are triaged. Documentation should include verification by the initials or signature of the person receiving the request or conducting triage;

- provide a system of chronic medical care for inmates, incorporating standards of the American Correctional Association and National Commission on Correctional Health Care for inmates' chronic medical care;

- develop and utilize a uniform management information system for logging chronic and mental health care, including, at a minimum, inmate name and number, facility location, date, type of condition;

- design and implement a computerized management information system that allows staff at all of the correctional facilities the capability to track and monitor inmates' chronic care and mental health appointments;

- secure all health records in sealed boxes and all medications in sealed envelopes prior to the transfer of inmates among correctional facilities. Also, the contract should require Wexford health care staff and MDOC transportation officers to sign off on the transfer record that lists all the medications the inmate has en route, the number of pills en route, and the number of doses en route. Upon arrival at the receiving correctional facility, Wexford health care staff should inventory the contents of the inmate's medication envelope to ensure that the contents reconcile with those listed on the transfer record.

According to a letter written by the Executive Director of the PEER Committee, dated May 6, 2008, MDOC did not add any of these provisions to its contract with Wexford. There were other recommendations that MDOC did not fully implement. Those recommendations, MDOC's response, and the PEER Committee's comment follow:

- **Recommendation 7:** For the purposes of ensuring compliance with contractual requirements, MDOC should require Wexford to design and implement a verifiable management information system that ensures that reports submitted by Wexford to MDOC accurately reflect information recorded on source documents – e.g., sick call logs, chronic care logs.

- **MDOC Response:** The Health Service Administrators (HSA) currently perform verification "spot checks" onsite. An electronic health record system would satisfy this recommendation.

- **PEER Response:** Since the review period, MDOC has not required Wexford to design any verifiable management information system for ensuring that inmate medical data received from Wexford is accurate and correct. As a result, MDOC cannot ensure that Wexford produces verifiable reports to show that all medical services requested by contract are being provided.

- **Recommendation 8:** MDOC should ensure that Wexford provides all necessary medical and maintains all medical record documentation as required in its inmate medical contract with the department. Also, in order to determine Wexford's compliance with contract provisions, MDOC should develop a formal audit methodology that includes appropriate statistical sampling to allow the department to extrapolate the sample results to the entire population.

- **MDOC Response:** This is currently being done. Exhibit "F" in the contract provides for an audit methodology.

- **PEER Response:** MDOC is continuing to use a limited sample that only allows for the review of 50 inmates per quarter for each medical compliance area of review. The current method does not implement an appropriate statistical sample that accounts for all inmates receiving medical care per quarter and does not allow the department to determine with any level of confidence whether Wexford is actually complying with the medical service contract requirements and providing the appropriate level of medical care to state inmates.

- **Recommendation 9:** MDOC should make formal demand to Wexford for the collection of liquidated damages provided for in the contract for failing to adhere to contractual requirements [for medical staffing].

- **MDOC Response:** MDOC prefers to work with Wexford to resolve problems rather than create an adversarial atmosphere. However, MDOC may submit a demand letter should the need arise.

- **PEER Response:** MDOC assessed approximately $1 million in staffing liquidated damages between January 2007 through June 2007. MDOC has still not collected any of the liquidated damages nor sent a demand letter to Wexford for collection of the liquidated damages. As a result, Wexford is not being held financially accountable for failure to comply with contract standards in regard to maintaining adequate levels of qualified staff to provide medical. Also, MDOC still has not recouped state funds paid for staffing that was not provided during the review period.

The Plaintiff claims that these problems have continued, and to demonstrate that claim, she has referred the Court to a case from the Northern District of Mississippi, *Presley v. Epps*, Civil Case No. 4:05cv148. That case resulted in a Consent Decree in which MDOC agreed to remedy deficiencies in health care at MDOC facilities. Among the issues addressed were delivery of medications in a timely fashion and processing requests for medical . As part of the ongoing review of health care at MDOC sites in conjunction with this litigation, a medical monitor visited MSP and three other facilities. CMCF was not included in this review; however, the monitor did evaluate SMCI, in which Wexford also provides health care.

In her report on her visit to MSP in July, 2011, the monitor found "persistent problems with the timeliness and quality of care for patients with serious medical conditions." In particular, she reviewed the records of six inmates who had died and noted that two of the deaths were likely preventable with the proper medical care, while, in the other four cases, "quality of care issues

resulted in avoidable pain and suffering prior to the patient's death." Issues that contributed to those findings included poor management of chronic diseases and lapses in medication.

The monitor visited SMCI in May and June, 2011. There, she found that prison staff routinely impeded access to medical care, and the medical staff failed to timely schedule medical care for patients with chronic illnesses. As at MSP, the monitor concluded that the failure to properly manage chronic illnesses resulted in death, as did the failure to appropriately respond to an emergency situation. She described the problems as "systemic, rather than isolated." The monitor's reports were delivered to Commissioner Epps, as he was a named Defendant in the *Presley* litigation. The Plaintiff claims that knowledge of the reports should be imputed to Lee and Holman, or, if not, that she should be permitted discovery to ascertain whether they were aware of their contents. With regard to Holman, the Plaintiff alleges that, when asked by Johnson's family to inquire about his medical care at CMCF, a staff member for Representative Parks contacted Deborah Holman, who is Superintendent Holman's wife. She asks, therefore, for discovery to determine whether Deborah Holman spoke with her husband, or with a member of the Superintendent's staff who informed him of the inquiry, about Johnson's condition.

Finally, with respect to Dr. Perry, the Plaintiff contends that she also received copies of the monitor's reports. Additionally, Dr. Perry had personal knowledge of the seriousness of Johnson's condition. Over the course of Johnson's incarceration, which began in 2009, the Plaintiff had contacted Dr. Perry several times about his treatment and medication. Johnson's attorney also corresponded with Dr. Perry on this issue. At one point, Johnson moved to be released from custody, on grounds of his medical condition. A lengthy hearing was held before the trial judge, at which witnesses testified as to Johnson's condition and the difficulties in controlling his blood sugar

level in prison. Dr. Perry attended that hearing; thus, she had personal knowledge of the need to closely monitor Johnson's blood sugar.

In response to the Plaintiff's contentions, the Defendants note that the monitor was retained by the Plaintiffs; therefore, her report was likely not objective. They also note that CMCF was not one of the facilities that she visited. As for the PEER Committee report, they argue that it covered a five-month period of time prior to Johnson's incarceration, while the Plaintiff's claims of deliberate indifference are related to a four-day period in July, 2012. They argue that all of these reports are irrelevant, as they are not findings made by a court. They further contend that transfer of records and medication between facilities is no longer necessary, as the electronic health record system can be accessed by the receiving facility. With regard to the allegations against Lee and Holman, the Defendants maintain that the Plaintiff has made only conclusory statements. Finally, according to the Defendants, the initial health screening, conducted in accordance with MDOC's official policy, identifies any chronic health issues and the need for medication to treat them.

The Plaintiff provided a document titled "Intrasystem Transfer - Receiving Screening," the subject of which is Sammy O'Neal Johnson." The document is dated July 25, 2012, and it shows CMCF as the Receiving Facility. The Health Care Screening - Intrasystem Transfer Policy promulgated by MDOC and discussed earlier in this Opinion provides that the intake health screening will include inquiry into "whether the offender is being treated for a medical or dental problem, whether the offender is presently on medication, and whether the offender has a current medical or dental complaint." CMCF's form lists the following questions, which were presumably asked of Johnson when he arrived at the facility:

> Current Medical, Mental Health or Dental Complaint: No
> Do you have any suicidal ideations?  No.
> Do you have a history of suicidal behavior?  No.
> Are you presently prescribed any psychotic medications?  No
> Do you currently have any mental health complaints?  No
> Are you currently being treated for mental health problems?  No
> Do you have a history of inpatient or outpatient psychiatric treatment?  No
> Do you have a history of substance abuse?  No

This form does not indicate that Johnson was asked during the intake process whether he was being treated for a chronic illness or whether he was taking any medication.

As the State Defendants correctly argue, they cannot be sued on a theory of *respondeat superior* for the actions of Wexford and its employees who were directly charged with Johnson's medical care. The doctrine of qualified immunity insulates them from liability, unless the Plaintiff can show that they violated a constitutional right that was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Prisoners are protected from "cruel and unusual" punishment by the Eighth Amendment, and it has been clearly established that deliberate indifference to a prisoner's serious medical needs constitutes an actionable Eighth Amendment violation under §1983. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The indifference must go beyond mere negligence, and it must result in substantial harm. *Coleman v. Sweetin*, 745 F.3d 756, 766 (5th Cir. 2014); *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993). A prison official may be liable under the Eighth Amendment if he "knows of and disregards an excessive risk to inmate health or safety; [however] the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

To establish that an official was deliberately indifferent to an inmate's serious health condition, a prisoner "must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Here, the Defendants who are moving for summary judgment are prison officials who were not directly involved in Johnson's care. They have been sued in their supervisory capacities, on grounds that they had a duty to implement and enforce policies that would have resulted in Johnson's receiving the insulin that had been prescribed to him and that he requested on several occasions.

As supervisory officials, the State Defendants can be liable, even if they did not directly participate in Johnson's treatment at CMCF, if they "implement[s] unconstitutional policies that causally result in the constitutional injury." *Gates v. Texas Dep't of Protective and Regulatory Services*, 537 F.3d 404, 435 (5th Cir. 2008). Failing to adopt a policy designed to prevent a foreseeable deprivation of constitutional rights can overcome a claim of qualified immunity. *Porter v. Epps*, 659 F. 3d 440, 446 (5th Cir. 2011). Even where government officials have adopted an official, written policy that is constitutional on its face, the term "policy," for this analysis, comprehends more. It also includes "the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011); *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 173 (1970); *see also City of Canton v. Harris*, 489 U.S. 378, 387 (1989) (under certain circumstances, the failure to train employees to properly implement a constitutional policy can be actionable). Failing to enforce a policy that is necessary for the safety of inmates can rise to the level of deliberate indifference. *Doe v. Robertson*, 751 F.3d 383, 391 n.10 (5th Cir. 2014) (citing *Tafoya v. Salazar*, 516 F.3d 912, 191 (10th Cir.

14

2008)). In order to find that a policy is necessary for the safety of the inmates, the plaintiff must show "[a] pattern of similar constitutional violations . . . ." *Porter*, 549 F.3d at 447; *see also Gallion v. Hinds Cnty.*, Civil Action No. 3:12cv736, 2014 WL 793347 (S.D. Miss. Feb. 26, 2014). The plaintiff must also show that the failure to enact or enforce a policy was the cause of his injury. *Connick*, 131 S. Ct. at 1358 n.5.

When a qualified immunity defense is raised at the summary judgment stage, the usual burden of proof is altered. *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005). The plaintiff must then rebut the defense. *Id.* "[T]he court looks to the evidence before it (in the light most favorable to the plaintiff) when conducting the [test for qualified immunity]." *Miles v. Rich*, No. 13-40427, 2014WL3748298 at *1 (5th Cir. July 31, 2014) (quoting *Behrens v. Pelletier*, 416 U.S. 299, 309 (1996)). To find that the plaintiff has overcome the qualified immunity defense, "the court must highlight evidence that, if interpreted in the light most favorable to the plaintiffs, identifies conduct by the defendant that violated clearly established law." *Castillo v. City of Weslaco*, 369 F.3d 504, 506 (5th Cir. 2004). If the court denies the motion for summary judgment, it should outline "'the factual scenario it believes emerges from viewing the summary judgment evidence in the light most favorable' to the plaintiff' and 'highlight the evidence in the record supporting its conclusions.'" *Miles*, at *1 (quoting *Castillo*, 369 F.3d at 507).

In certain cases, it may be impossible to fairly rule on the qualified immunity question on the facts adduced by the parties early in the litigation. Those cases may be appropriate for narrowly-tailored discovery, designed to more fully flesh out the evidence supporting or negating the immunity claim. Because, however, the doctrine of qualified immunity is designed to provide immunity from *suit*, not just from liability, a court should not permit overbroad, cumbersome, or expensive

discovery that effectively destroys the purpose of the immunity doctrine. *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012). In order to permit such discovery, a court must first find that the plaintiff has "plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Id.* at 648. Once that finding is made, the court must identify the questions of fact that cannot be resolved without further discovery. *Zapata v. Melson*, 750 F.3d 481, 485 (5th Cir. 2014). Finally, the court must craft a discovery order "narrowly tailored to uncover only those facts needed to rule on the immunity claim . . . ." *Boulos v. Wilson*, 834 F.2d 504, 507-08 (5th Cir. 1987)

The undersigned is of the opinion that the Plaintiff has adequately pleaded that Defendant Epps was well aware that Wexford was deficient in numerous areas of providing health care to MDOC inmates, including management of chronic conditions and processing sick call requests. The parties do not appear to dispute that Johnson died as the result of the failure of Wexford staff at CMCF to give him insulin, and the Plaintiff has specifically pleaded that Johnson made numerous requests for this medicine. It also appears that MDOC took little action in response to the PEER Commission's report on Wexford's performance. The reports from the monitor in the *Presley* litigation, which were sent to Epps, showed that, as of 2011, the monitor believed that the deficient health care provided by Wexford at MSP and SMCI had resulted in inmates' deaths and that Wexford's problems were "systemic." This evidence could support the Plaintiff's claim that, despite the official MDOC policies related to the medical treatment of inmates, the actual policy was to permit substandard care that ignored the serious health care needs of those inmates, even if that care resulted in substantial injury or death. While these reports do not conclusively prove that the PEER Committee's or the monitor's assessments were accurate, the Plaintiff is not required to prove her

case at this point, but only to have stated a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). Similar evidence has been found sufficient to support a jury's verdict that a pretrial detainee was subjected to unconstitutional conditions of confinement through a pattern of acts or omissions that constituted a policy. *Duvall v. Dallas Cnty*, 631 F.3d 203, 208-09 (5th Cir. 2011) (where plaintiff suffered serious permanent injury from contracting a MRSA staph infection, evidence showed that the rate of infection in that particular jail was twenty times higher than comparable jails and preventative measures were inadequate); *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 450-51 (5th Cir. 2009) (where plaintiff suffered a stroke because he did not get regular medication for his hypertension, reports from a private management team and the Department of Justice demonstrated inadequate care of chronic diseases). The Plaintiff has also alleged that Dr. Perry had specific knowledge of the severity of Johnson's diabetes and his need for regular administration of insulin, by virtue of her attendance at the hearing on his motion for an early release.

The test for deliberate indifference is subjective. *Farmer*, 511 U.S. at 840. The Court cannot determine from the pleadings and exhibit before it whether Holman, Lee, and Perry knew about the reports from the PEER Commission and the independent monitor, or whether they had knowledge of the health care issues attributed to Wexford, and the Plaintiff should be permitted to explore this subject in discovery. Additionally, in order to overcome the qualified immunity defense, the plaintiff must show a causal link between the unconstitutional policy and Johnson's death. *Connick*, 131 S. Ct. at 1358 n.5. The Court cannot ascertain whether any failure of the State Defendants to hold Wexford to the standards demanded in its contract with the State, or the standards of medical practice in general, caused Johnson to be denied insulin. The Plaintiff should be allowed to develop

additional facts surrounding the events of July 25-28 at CMCF and what failure in the health care system allowed this to occur.

The Plaintiff has requested that she be allowed to conduct discovery designed to determine whether the State Defendants adhered to the policies offered by them in support of their Motion for Summary Judgment. As discussed in the preceding paragraph, the Court is of the opinion that this discovery should be allowed. She has also requested discovery to determine whether Deborah Holman "made inquiry to CMCF regarding Mr. Johnson's medical situation, and whether or not her husband, superintendent Holman was made aware of the inquiry." For the reasons earlier outlined, this discovery should also be allowed. The Plaintiff has asked to conduct discovery designed to identify and obtain evidence from any inmates who helped Johnson with his medical requests or who helped him get to the control station on July 28, 2012. In support of her request, she states that the discovery is necessary to determine "whether or not the circumstances of Mr. Johnson's denial of treatment are congruent with the established pattern of tardy or denied medical treatment, as well as whether they were consistent with a pattern of personnel who were not sufficiently trained to identify emergent medical conditions, all contrary to the policy documents on which the Defendants base their immunity claim." This discovery should be permitted. The Plaintiff has asked for discovery that would enable her to identify and obtain evidence from the guards and other staff on duty at CMCF from July 25-28, 2012, to determine "whether or not there was a pattern of inadequate training contrary to the Defendants' policy documents on which they base their immunity claim, as well as determining whether there was a custom of not providing timely and appropriate medical care and medications, contrary to the policy documents on which the Defendants base their immunity claim." This discovery is appropriate and should be permitted. The Plaintiff has also asked for

18

discovery into "any and all other areas referenced and specified in the Plaintiff's Memorandum Brief and Response to Defendants' Motion for Summary Judgment which are not specifically set forth in the instant Motion by the Plaintiffs." The undersigned would not recommend that the Court grant discovery into so broad and ambiguous a subject matter. The Plaintiff also asks for additional discovery, "where it is necessary to resolution of the Defendants' Motion for Summary Judgment." As with the preceding request, the undersigned is of the opinion that the Court need not grant such a far-reaching request at this time, but simply entertain additional specific requests on their merits when they arise.

It is further the opinion of the undersigned that it would be premature for this Court to deny the Defendants' Motion for Summary Judgment on the merits at this time. It is likely that the arguments for and against the Motion will be altered by the evidence obtained during discovery, however, and re-briefing will almost certainly be necessary. For that reason, the undersigned recommends that the Motion for Summary Judgment be denied at this time, but without prejudice to the Defendants' right to re-file it after discovery is complete.

In accordance with the Rules of this Court, any party, within fourteen days after being served a copy of this report, may serve and file written objections to the proposed findings, conclusions, and recommendations contained in this report. The District Judge at that time may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or may receive further evidence or recommit the matter to the undersigned with instructions. Failure to file written objections will bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

*Douglass v. United Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *superceded by statute on other grounds*, 28 U.S.C. § 636(b(1).

This the 3rd day of September, 2014.

Linda R. Anderson
UNITED STATES MAGISTRATE JUDGE